**J.C., a minor by and through her guardian ad litem R.C., Plaintiff,**

v.

**BEVERLY HILLS UNIFIED SCHOOL DISTRICT; Erik Warren, both in his individual capacity and as principal of Beverly Vista School, Cherryne Lue-Sang, both in her individual capacity and as assistant principal of Beverly Vista School; and Janice Hart, both in her individual capacity and as an employee of Beverly Vista School, Defendants.**

No. CV 08–03824 SVW (CWx).

United States District Court,
C.D. California.

May 6, 2010.

Evan Seth Cohen, S. Martin Keleti, Cohen and Cohen, Los Angeles, CA, for Plaintiff.

Gary R. Gibeaut, Nancy Ann Mahan-Lamb, Gibeaut Mahan and Briscoe, Los Angeles, CA, for Defendants.

AMENDED ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AS TO HER FIRST AND SECOND CAUSES OF ACTION FOR VIOLATION OF 42 U.S.C. § 1983, AND GRANTING INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF QUALIFIED IMMUNITY AS TO THE FIRST CAUSE OF ACTION [45][50]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION [1]

Plaintiff J.C. brought this action against the Beverly Hills Unified School District, and school administrators Erik Warren, Cherryne Lue–Sang, and Janice Hart ("the individual Defendants"), for the alleged violation of her constitutional rights. Plaintiff seeks injunctive relief, as well as damages against the individual defendants, and nominal damages in the amount of $1.00 against the School District.

The parties have brought cross motions for summary adjudication. Plaintiff J.C. seeks summary adjudication as to her First and Second Causes of Action against the individual Defendants and the District for the alleged violation of her First Amendment rights under 42 U.S.C. § 1983. Plaintiff also seeks summary adjudication on her Third Cause of Action for violation of her right of due process, also under section 1983.

The individual Defendants, Warren, Hart, and Lue–Sang, seek summary adjudication as to the First Cause of action for money damages on the grounds of qualified immunity.

For the reasons stated below, the Court GRANTS Plaintiff's motion for summary adjudication as to the First and Second Causes of Action. An order regarding Plaintiff's due process claim, the Third Cause of Action, will follow shortly.

The Court also GRANTS the individual Defendants' motion for summary adjudication. The individual Defendants are entitled to qualified immunity on Plaintiff's First Cause of Action for money damages.

## II. FACTS

The following material facts are undisputed. Plaintiff J.C. was a student at

---

1. The Court initially issued this Order on November 16, 2009. After the Order was filed, the Third Circuit issued rulings upon review of two of the district court cases cited herein, *Layshock v. Hermitage,* 593 F.3d 249 (3d Cir. 2010) and *J.S. ex rel Snyder v. Blue Mountain* *Sch. Dist.,* 593 F.3d 286 (3d Cir.2010). The Court amends this Order solely to address these Third Circuit opinions to the extent they are relevant to the Court's analysis. The outcome in this case has not changed.

Beverly Vista High School ("the School") in May 2008. Individual Defendant Erik Warren ("Warren") is, and at all relevant times was, the principal of the School. Individual Defendants Cherryne Lue–Sang ("Lue Sang") and Janice Hart ("Hart") are, and at all relevant times, were the administrative principal and counselor at the School, respectively.

On the afternoon of Tuesday, May 27, 2008, after the students had been dismissed from the School for the day, Plaintiff and several other students gathered at a local restaurant. (Plaintiff's Statement of Undisputed Facts in Support of Motion for Summary Adjudication ["PSUF"] 1.) While at the restaurant, Plaintiff recorded a four-minute and thirty-six second video of her friends talking. (PSUF 7.) The video was recorded on Plaintiff's personal video-recording device. (*Id.*) The video shows Plaintiff's friends talking about a classmate of theirs, C.C. (PSUF 8.) One of Plaintiff's friends, R.S., calls C.C. a "slut," says that C.C. is "spoiled," talks about "boners," and uses profanity during the recording. (Defendants' Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Adjudication ["DSUF"] 7; Declaration of J.C. in Support of Pl.'s Mot. For Summ. Adjudication ["J.C. Supporting Decl."], Exh. 1 [YouTube video].) R.S. also says that C.C. is "the ugliest piece of shit I've ever seen in my whole life." (J.C. Supporting Decl., Exh. 1 [YouTube video].) During the video, J.C. is heard encouraging R.S. to continue to talk about C.C., telling her to "continue with the Carina rant." (DSUF 9.)

In the evening on the same day, Plaintiff posted the video on the website "YouTube" from her home computer. (DSUF 10.) YouTube is a publicly-available website where persons can post video clips for viewing by the general public. While at home that evening, Plaintiff contacted 5 to 10 students from the School and told them

to look at the video on YouTube. She also contacted C.C. and informed her of the video. (DSUF 11–12.) C.C. told Plaintiff that she thought the video was mean. (Declaration of John W. Allen in Opp'n to Pl. Mot. For Summary Judgment ["Allen Opp'n Decl."], Exh. H, [J.C. Depo. at 53:25–54:17].) Plaintiff asked C.C. whether she would like Plaintiff to take the video off the website, but C.C. asked her to keep the video up. (*Id.* at 53:25–54:17.) C.C.'s mother told C.C. to tell Plaintiff to keep the video on the website so that they could present the video to the School the next day. (DSUF at 17.)

Plaintiff estimates that about 15 people saw the video the night it was posted. The video itself received 90 "hits" on the evening of May 27, 2008, many from Plaintiff herself. (DSUF 13–14.)

On May 28, 2008, at the start of the school day, Plaintiff overheard 10 students discussing the video on campus. (DSUF 15.) C.C. was very upset about the video and came to the School with her mother on the morning of May 28, 2008 so they could make the School aware of the video. C.C. spoke with school counselor Hart about the video. She was crying and told Hart that she did not want to go to class. (DSUF 18, 20.) C.C. said she faced "humiliation" and had "hurt feelings." (PSUF 20.) Hart spent roughly 20–25 minutes counseling C.C. and convincing her to go to class. (DSUF 22.) C.C. did return to class, and the record indicates that she likely missed only part of a single class that morning. (*Id.*; Declaration of John Allen In Support of Def.'s Mot. For Summary Judgment ["Allen Supporting Decl."], Exh. N [Lue Sang Depo. at 15:4–11] [testifying that she met with C.C. and her mother for, at most, 45 minutes].)

School administrators then investigated the making of the video. Lue–Sang viewed the video while on the school cam-

pus. (Decl. of S. Martin Keleti in Support of Pl. Mot. ["Keleti Supporting Decl."], Exh. A ["Lue–Sang Depo. at 95:4–7]."") She called Plaintiff to the administrative office to write a statement about the video. (PSUF 13.) Lue–Sang and Hart also demanded that Plaintiff delete the video from YouTube, and from her home computer. (PSUF 17.) School administrators questioned the other students in the video, including R.S., V.G., and A.B., and asked each of them to make a written statement about the video. (DSUF 25.) R.S.'s father came to the School and watched the video with R.S. on campus. (DSUF 23.) He then took R.S. home for the rest of the day. (*Id.*)

Lue–Sang and Hart also contacted principal Warren regarding the video. (PSUF 15.) Warren then contacted Amy Lambert, the Director of Pupil Personnel for the District, regarding whether the School could take disciplinary action against Plaintiff for posting the video on the Internet. (DSUF 37.) Lambert discussed the situation with attorneys and advised Warren that Plaintiff could be suspended. (DSUF 38.) Plaintiff was suspended from school for two days. (PSUF 25.) No disciplinary action was taken against the other students in the video. (PSUF 27.)

Plaintiff had a prior history of videotaping teachers at the School. In April 2008, Plaintiff was suspended for secretly videotaping her teachers, and was told not to make further videotapes on campus. (DSUF 43–44.) During the investigation about the YouTube video on May 28, 2008, school administrators also discovered another video posted by Plaintiff on YouTube of two friends talking on campus. (DSUF 41.) It is unclear when this video was recorded or posted on the Internet, but it clearly was made while J.C. was at School.[2]

Students at the School cannot access YouTube or other social networking websites on the School's computers, as those websites are blocked by means of a filter. (PSUF 29.) Certain cell phones can access the Internet, including the YouTube website, and allow the user to view videos. (DSUF 35.) However, the School is not aware of how many students have cell phones with that capability. (PSUF 31.) Students at the School are prohibited from using their cell phones on campus in any manner. (PSUF 30.) There is no evidence that any student viewed the YouTube video on his or her cell phone while at School. The only instances the video was viewed on campus, to the parties' knowledge, were during the school administrator's investigation of the video.

## III. ANALYSIS

### A. Legal Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that party bears the burden of proof at trial, it must affirmatively establish all elements of its legal claim. *See Southern Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885 (9th Cir.2003) (per curiam). Otherwise, the moving party may satisfy its Rule 56(c)

---

**2.** These videos are not of the same variety of the YouTube video that is the subject of this lawsuit.

burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000). Genuine disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

Finally, the nonmoving party may show that a genuine issue exists for trial if, although the facts are largely undisputed, reasonable minds could differ as to the ultimate conclusions to be drawn from those facts. *Sankovich v. Life Ins. Co. of North America,* 638 F.2d 136, 140 (9th Cir.1981); 49 C.J.S. JUDGMENTS § 301 (2009) (even where court believes the moving party is more likely to prevail at trial, summary judgment must be denied if a reasonable jury could return a verdict for the nonmoving party).

## B. Violation of First Amendment Rights

■ Plaintiff contends that the School District and the school administrators, Hart, Lue–Sang, and Warren, violated her First Amendment rights by punishing her for making the YouTube video and posting it on the Internet. Plaintiff argues that the School had no authority to discipline her because her conduct took place entirely outside of school. To resolve this issue, the Court must first determine the scope of a school's authority to regulate speech by its students that occurs off campus but has an effect on campus.

### 1. The Supreme Court Student Speech Precedents

In 1969, the Supreme Court held in *Tinker v. Des Moines Independent Community School District* that a school may regulate a student's speech or expression if such speech causes or is reasonably likely to cause a "material and substantial" disruption to school activities or to the work of the school. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker,* two high school students and one junior high school student wore black armbands to school in protest of the Vietnam War. School officials asked them to remove the armbands, and they refused. Pursuant to a school policy adopted just days before in anticipation of a protest, the students were suspended until they would return to school without the armbands. *Id.* at 504, 89 S.Ct. 733. The lower court upheld the suspension, but the Supreme Court reversed. *Id.* at 514, 89 S.Ct. 733.

In an oft-quoted passage, the Court noted: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. 733. The Court found that the students' expression constituted political speech. Although the issues raised by such speech were undoubtedly controversial—the propriety of the Vietnam War—the students' conduct was "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [their]

part." *Id.* at 508, 89 S.Ct. 733. The Court held that a student may express his opinions, even on controversial subjects, so long as doing so does not materially and substantially "interfer[e] with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others." *Id.* at 513, 89 S.Ct. 733 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)). Conversely, school discipline is appropriate where the facts "reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" as a result of the student's speech. *Id.* at 514, 89 S.Ct. 733.

Applying this test to the facts in *Tinker*, the Court concluded that no actual disruption occurred and there was no reason to believe that the students' wearing of the armbands would cause a substantial disruption to the school's activities. Thus, the school's disciplinary action violated the students' First Amendment rights. *Id.*

The Supreme Court decided three cases after *Tinker* that carved out narrow categories of speech that a school may restrict even without establishing the reasonable threat of substantial disruption. First, in *Bethel School District v. Fraser*, the Court held that there is no First Amendment protection for lewd, vulgar or "patently offensive" speech that occurs in school. 478 U.S. 675, 684–85, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). In *Fraser*, a high school student gave a speech nominating a fellow student for elective office at an assembly held during school hours. Nearly 600 students attended the assembly. *Id.* at 677, 106 S.Ct. 3159. The speech was an "elaborate, graphic, and explicit sexual metaphor." *Id.* at 678, 106 S.Ct. 3159. The student was suspended for making the speech. The School argued that the speech violated a school rule which prohibited "conduct which materially and substantially interferes with the educational

process ... including the use of obscene, profane language or gestures." *Id.*

The Court upheld the disciplinary action. The Court held that the First Amendment rights "of students in public school are not automatically coextensive with the rights of adults in other settings," and must be applied in light of the special characteristics of the school environment. *Id.* at 682–83, 106 S.Ct. 3159. The court reasoned that public schools have an affirmative obligation to instill in students the "fundamental values of 'habits and manners of civility' essential to a democratic society" and to teach students "the boundaries of socially appropriate behavior." *Id.* at 681, 106 S.Ct. 3159. Thus, while Matthew Fraser could have given his salacious speech outside of the school and could not have been "penalized simply because government officials considered his language inappropriate," the same is not true of speech occurring within the school. *Id.* at 688, 106 S.Ct. 3159 (Blackmun, J. concurring); *see id.* at 682, 106 S.Ct. 3159 (students have *the classroom right* to wear Tinker's armband, but not Cohen's jacket") (emphasis added) (quoting *Thomas v. Board of Educ.*, 607 F.2d 1043, 1057 (2d Cir.1979)). The Court held that where a student engages in lewd, vulgar, or plainly offensive speech at school, the school may regulate such speech as part of its duty to convey to its students "the essential lessons of civil, mature conduct." *Id.* at 683, 106 S.Ct. 3159. Ultimately, the determination of what manner of speech is inappropriate "in the classroom or in a school assembly" properly rests with the school board. *Id.*

In 1988, the Court carved out another exception from *Tinker* for school-sponsored speech. *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, the Court upheld a school principal's decision

to delete two articles discussing teen pregnancy and divorce from the school-sponsored newspaper. The Court held that the school could "exercis[e] editorial content over the style and content of student speech in school-sponsored expressive activities as long as [doing so is] reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562. Distinguishing *Tinker*, the Court explained that the issue of whether a school must tolerate particular student speech is different from whether the school must affirmatively promote particular speech. *Id.* at 270, 108 S.Ct. 562. In sum, "educators are entitled to exercise greater control" over speech that might reasonably be perceived to "bear the imprimatur of the school." *Id.* at 271, 108 S.Ct. 562.

Finally, in the Supreme Court's most recent decision addressing student speech, *Morse v. Frederick*, the Court held that a school may restrict "student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). In *Morse*, a student attending the Olympic Torch Relay that passed on the street in front of his high school unfurled a 14–foot banner that read "BONG HiTS 4 JESUS." *Id.* at 397, 127 S.Ct. 2618. The school principal asked that the student take the banner down, and he refused. The principal confiscated the banner and suspended the student. *Id.* at 398, 127 S.Ct. 2618.

In reviewing the disciplinary action in *Morse*, the Court promulgated a narrow holding decidedly restricted to the facts of the case. The Court found that the Torch Relay was a school-sponsored event occurring during school hours, which the principal permitted students and faculty to attend. *Id.* at 397, 127 S.Ct. 2618. Therefore, the Court viewed the speech as equivalent to speech occurring in school. *Id.* at 401, 127 S.Ct. 2618 (a student "cannot stand in the midst of his fellow students, during school hours, at a school-sanctioned activity and claim he is not in school") (internal quotations omitted). The Court also found that the student's banner condoned illegal drug use. The Court noted that neither *Hazelwood* nor *Fraser* governed its decision, as the student's banner did not bear "the school's imprimatur" nor was it lewd, vulgar, or "plainly offensive." *Id.* at 405–06, 409, 127 S.Ct. 2618. Instead, the Court focused on the special characteristics of the school environment and the "governmental interest in stopping student drug abuse" and concluded that schools may restrict student expression at a school-sponsored event that they reasonably regard as promoting illegal drug use. *Id.* at 408, 127 S.Ct. 2618.[3]

### 2. Application of the Student Speech Precedents by Lower Courts

The Supreme Court has yet to address the factual situation presented by the case at hand—that is, whether a school can regulate student speech or expression that occurs outside the school gates, and is not connected to a school-sponsored event, but that subsequently makes its way onto campus, either by the speaker or by other

---

**3.** Justice Thomas, in his concurring opinion, expressed concern about the Court's creation of a third carve-out from the rule in *Tinker*. Thomas insightfully noted: "[W]e continue to distance ourselves from *Tinker*, but we neither overrule it nor offer an explanation of when it operates and when it does not. I am afraid that our jurisprudence now says that students have a right to speak in schools except when they don't—a standard continuously developed through litigation against local schools and their administrators." 551 U.S. at 418–19, 127 S.Ct. 2618. Given the difficulty with which this Court has decided Plaintiff's motion, and the variety of divergent applications of *Tinker* in the lower courts, the Court shares Justice Thomas' concerns.

means. Several lower courts, including the Ninth Circuit, however, have held that a school may regulate such speech under *Tinker*, if the speech causes or is reasonably likely to cause a material and substantial disruption of school activities.

In *LaVine v. Blaine School District*, the Ninth Circuit upheld a school's emergency expulsion of a student, James, who wrote a graphic and violent poem about killing his classmates. 257 F.3d 981 (9th Cir.2001). The poem was written off campus, in the evening, and not as part of any school project. *Id.* at 983. James later brought the poem to campus to show one of his teachers. The teacher was disturbed by the poem and brought it to the school counselor and eventually to the principal. After an investigation regarding the poem and James' history, James was expelled. *Id.* at 986.

The Ninth Circuit analyzed the speech under *Tinker*, without giving any consideration to the fact that the poem was drafted outside of school and independent of any school activities. The court outlined the following framework for applying the Supreme Court student speech precedents: "(1) vulgar, lewd, obscene and plainly offensive speech is governed by *Fraser*; (2) school-sponsored speech is governed by *Hazelwood*; and (3) speech that falls into neither of these categories is governed by *Tinker*." *Id.* at 988–89.[4] Finding that

James's poem clearly fell in the third category, "all other speech," the court applied the substantial disruption test from *Tinker*. *Id.* at 989. The Ninth Circuit ultimately concluded that the school was reasonable to portend a substantial disruption and upheld James's expulsion. *Id.* at 992.

Like *LaVine*, many other courts analyzing off-campus speech that subsequently is brought to campus or to the attention of school authorities apply the substantial disruption test from *Tinker* without regard to the location where the speech originated (off campus or on campus). *See, e.g., Shanley v. Northeast Independent Sch. Dist.*, 462 F.2d 960, 970–71 (5th Cir.1972) (applying *Tinker* where student-created underground newspaper was authored and distributed off campus, but some of the newspapers turned up on campus); *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827–28 (7th Cir.1998) (student disciplined for an article printed in an underground newspaper that was distributed on school campus); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F.Supp.2d 446, 455 (W.D.Pa.2001) (applying *Tinker* where student was disciplined for composing degrading top-ten list and distributing it off campus to friends via email, and where one recipient subsequently brought the list to campus); *Emmett v. Kent Sch. Dist. No. 415*, 92 F.Supp.2d 1088, 1090 (W.D.Wash. 2000) (applying *Tinker* to a website creat-

---

4. The Ninth Circuit established this framework in the earlier case *Chandler v. McMinnville School District*, 978 F.2d 524, 529 (9th Cir.1992). In *Chandler*, students were punished for wearing buttons and stickers with the word "Scab" printed on them, in protest of the school's hiring of replacement teachers when many of the school's regular teachers went on strike. *Id.* at 526. The court found that the protest was not lewd or vulgar under *Fraser* nor was it school-sponsored as in *Hazelwood*. Thus, the court concluded that *Tinker* was the governing standard. *Id.* at 529 ("The third category involves speech that is neither vulgar, lewd, obscene, or plainly

offensive, nor bears the imprimatur of the school. To suppress speech in this category, school officials must justify their decision by showing 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'") (quoting *Tinker*, 393 U.S. at 514, 89 S.Ct. 733). *Chandler*, however, did not address student speech originating off campus.

The same three-part framework was reiterated after the holding in *LaVine*, in the Ninth Circuit case *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir.2006).

ed by a student off campus that contained mock obituaries of some of the author's classmates); *Beussink v. Woodland R–IV Sch. Dist.*, 30 F.Supp.2d 1175, 1180 (E.D.Mo.1998) (applying *Tinker* to a website created by a student off campus that contained criticism of school authorities, where another student accessed the website at school and showed it to a teacher); *O.Z. v. Board of Trustees of Long Beach Unified Sch. Dist.*, No. CV 08–5671 ODW, 2008 WL 4396895, *4 (C.D.Cal., Sept. 9, 2008) (student discipline upheld under *Tinker* where student created a video off campus during spring break that depicted a graphic dramatization of a teacher's murder and then posted the video on the Internet); *Pangle v. Bend–Lapine Sch. Dist.*, 169 Or.App. 376, 10 P.3d 275, 285–86 (Ct.App.Or.2000) (applying *Tinker* to an underground newsletter distributed on campus).

In these cases, the courts have directly applied the *Tinker* substantial disruption test to determine if a First Amendment violation occurred, without first considering the geographic origin of the speech. As the district court for the Central District of California recently explained in *O.Z. v. Board of Trustees:* "[T]he fact that Plaintiff's creation and transmission of the [speech or expression] occurred away from school property does not necessarily insulate her from school discipline.... [O]ff-campus conduct can create a foreseeable risk of substantial disruption within a school." 2008 WL 4396895, *4. In sum, the substantial weight of authority indicates that geographic boundaries generally carry little weight in the student-speech analysis. Where the foreseeable risk of a substantial disruption is established, discipline for such speech is permissible. *See J.S. ex rel. Snyder v. Blue Mountain*, 593 F.3d 286, 301 (3d Cir.2010) ("[W]e hold that off-campus speech that causes or reasonably threatens to cause a substantial disruption ... with a school need not satis-

fy any geographical technicality in order to be regulated pursuant to *Tinker*.") *Killion*, 136 F.Supp.2d at 455 (holding that the court need not consider plaintiff's argument that a heightened standard applies to speech occurring off school grounds because "[t]he overwhelming weight of authority has analyzed student speech (whether on or off campus) in accordance with *Tinker* ").

Some courts (primarily the Second Circuit), however, have considered the location of the speech to be an important threshold issue for the court to resolve before applying the Supreme Court's student speech precedents. For example, in a recent case involving communication over the Internet, the Second Circuit considered the nexus between the speech and the school campus. *Wisniewski v. Board of Educ. of the Weedsport Central Sch. Dist.*, 494 F.3d 34 (2d Cir.2007). In *Wisniewski*, a middle school student, Aaron, was using AOL Instant Messaging ("IM") software on his home computer. Aaron created an icon used to identify himself when sending instant messages to his friends. The icon was a small drawing of a pistol firing a bullet at a man's head above which were dots indicating splattered blood. Beneath the drawing were the words "Kill Mr. Vander–Molen." Mr. Vander–Molen was Aaron's English teacher. *Id.* at 35–36. Another student printed a copy of the icon and gave it to Mr. Vander–Molen at school, who later brought the matter to the school principal. *Id.* at 36. After disciplinary hearings, Aaron was suspended.

The Second Circuit applied *Tinker* to the school's decision, but first discussed the nexus between Aaron's icon and the school campus. The court noted that "the panel is divided as to whether it must be shown that it was reasonably foreseeable that Aaron's IM icon would reach the

school property or whether the undisputed fact that it did reach the school pretermits any [such] inquiry." *Id.* at 39. Ultimately, however, the court concluded that the violent nature of the icon and the fact that Aaron transmitted it via the Internet to 15 of his friends over a three week period made it foreseeable that the icon would eventually come to the attention of the school authorities and Mr. Vander–Molen. *Id.* at 39–40. Thus, *Tinker* applied.

Similarly, in *Doninger v. Niehoff,* cited by Defendants here, the Second Circuit again considered the location of a student's speech. 527 F.3d 41 (2d Cir.2008). The student in *Doninger,* Avery, sent an email to students and parents affiliated with the school and posted a message on her personal blog criticizing the school for cancelling a school event. Avery's email and blog posting encouraged the recipients to contact the school officials and complain about the cancellation of the event. *Id.* at 44–46. Applying the rule from *Wisniewski* to Avery's speech, the court concluded that it was reasonably foreseeable that Avery's message would reach the school campus. *Id.* at 50. Indeed, the message was purposefully designed to come to campus-it encouraged readers to contact the school and voice their dissatisfaction regarding the cancelled event. *Id.* Moreover, after the message was posted, the school received numerous calls and emails from persons concerned about the event. *Id.* at 44. Thus, there was no dispute that the speech had its desired effect. The court concluded that Avery's message was governed by *Tinker,* and found that the substantial disruption test was met. *Id.* at 50–52.

Finally, in *J.S. v. Bethlehem Area School District,* the Supreme Court of Pennsylvania analyzed whether J.S. could be disciplined for a website he created, which contained violent and derogatory comments about school officials. 569 Pa. 638, 807 A.2d 847 (2002). In deciding whether school discipline was appropriate, the court noted that the "location" of the speech is the first inquiry. That is, the court must determine if the speech was on-campus speech subject to *Tinker,* or purely off-campus speech, "which would arguably be subject to some higher level of First Amendment protection." *Id.* at 864.

Applying the facts of the specific case, the court in *Bethlehem* concluded that there was "a sufficient nexus" between the website and the school campus to warrant application of the Supreme Court's student speech precedents. *Id.* at 865. Notably, J.S. had accessed the website during class and informed other students about it. Also, members of the faculty accessed the website at school, and school officials were the subjects of the website. *Id.* In light of these facts, "it was inevitable that the contents of the website would pass from students to teachers." *Id.* The court therefore applied *Tinker* and found that the website created a substantial disruption. *Id.* at 869.

Plaintiff argues in her motion for summary adjudication that the location of the speech (whether on or off campus) is wholly dispositive. Plaintiff contends that "if the publication of a student's speech does not take place on school grounds, at a school function, or by means of school resources, a school cannot punish the student without violating her First Amendment rights." (Mot. at 8.) Thus, Plaintiff contends that because she made the video and posted it on the Internet while off campus and without using the School's equipment, the School had no authority to regulate her conduct.

This argument is not supported by the long line of cases discussed above. *See, e.g., Doninger,* 527 F.3d at 50 (where off-campus speech creates a foreseeable risk of substantial disruption within a school,

"its off-campus character does not necessarily insulate the student from school discipline."). Indeed, even those cases in the Second Circuit that analyze the origin of the speech as a relevant consideration have not gone so far as to hold that speech originating off campus can never be regulated. Nonetheless, the Court will address the authority cited by Plaintiff.

In support of her argument, Plaintiff cites the Second Circuit case *Thomas v. Board of Educ.,* 607 F.2d 1043 (2d Cir. 1979). In *Thomas,* several students created an independent non-school-sponsored newspaper modeled after National Lampoon, a publication specializing in sexual satire. The publication was created in the students' homes, off campus, and after school hours. *Id.* at 1045. However, one teacher was aware of the publication and allowed the students to store copies of the newspaper in a classroom closet. *Id.* Apart from the storage on-campus, the authors "assiduously endeavored to sever all connections between their publication and the school." *Id.* They included a disclaimer on the newspaper disclaiming responsibility for copies found on campus. They printed the papers outside the school and sold the papers after school hours at a store away from the school grounds. *Id.* Despite these efforts, a student brought the paper to school, and the authors were punished for its sexual content. *Id.* at 1045–46.

The Second Circuit found that *Tinker* was not applicable because "all but an insignificant amount of relevant activity in this case was *deliberately designed* to take place beyond the schoolhouse gate." *Id.* at 1050 (emphasis added). The court held that, on these facts, the school's authority to punish the speech was governed by the same principals that "bind government officials in the public arena." *Id.* The court concluded that the "school officials [were] powerless to impose sanctions for expres-

sion beyond school property in this case." *Id.* at 1050 n. 13.

While *Thomas* undoubtedly supports a threshold consideration of the origin of the speech and its relationship to on-campus activity, the holding does not stretch as far as Plaintiff contends. First, the *Thomas* court specifically limited its holding to the facts in that case—i.e., where the students took specific efforts to segregate their speech from campus. *Id.* at 1049. Second, although the court found that *Tinker* did not apply given the "de minimis" connections between the speech and the school, the court was careful to note that *Tinker* could apply in a case "in which a group of students incites substantial disruption within the school from some remote locale." *Id.* at 1052 n. 17. The court went on to find that no disruption (or foreseeable risk thereof) existed, thus obviating the need for any such analysis. *Id.* Finally, *Thomas* was decided in 1979, before schools were confronted by the unique problems presented by student expression conducted over the Internet. Subsequent cases interpreting *Thomas* find that "territoriality is not necessarily a useful concept in determining the limit of [school administrators'] authority." *Doninger,* 527 F.3d at 48–49 (citing *Thomas,* 607 F.2d at 1058 n. 13 (Newman, J., concurring in the result)); *see Layshock v. Hermitage Sch. Dist.,* 496 F.Supp.2d 587, 598 (W.D.Penn. 2007)("It is clear that the test for school authority is not geographical."), *affirmed, Layshock v. Hermitage Sch. Dist.,* 593 F.3d 249 (3d Cir.2010). This is especially true today where students routinely "participate in ... expressive activity ... via blog postings, instant messaging, and other forms of electronic communication." *Doninger,* 527 F.3d at 49.

Plaintiff also cites *Porter v. Parish School Board,* 393 F.3d 608 (5th Cir.2004), in support of her position. In *Porter,* a

student, Adam, was expelled when his younger brother unwittingly brought to school a drawing Adam had made "depicting the school under a state of siege by a gasoline tanker truck, missile launcher, helicopter, and various armed persons." *Id.* at 611. Adam made the drawing at home two years earlier, and stored the writing pad containing the drawing in his bedroom closet. His younger brother found the writing pad at some point and used it to make his own notations, which he then brought to school. When the bus driver saw Adam's drawing on one of the pages in the writing pad, she contacted the school authorities and disciplinary action ensued. *Id.* at 611–12.

The Fifth Circuit held that "[g]iven the unique facts of the present case, we decline to find that Adam's drawing constitutes student speech on the school premises." *Id.* at 615. The court recognized that several courts had applied *Tinker* to speech originating off campus that was later brought to school, citing *LaVine*, *Boucher*, *Killion*, and *Beussink*, among others. *Id.* at 615 n. 22. However, the court found that such cases were factually distinguishable from the present case because, unlike in those cases, Adam "never intended [the drawing] to be brought to campus" and "took no action that would increase the chances that his drawing would find its way to school." *Id.* at 615. Further, the drawing was not "publicized in a way certain to result in its appearance at [the School]". *Id.* at 620. On these facts, the court concluded that the school's disciplinary action violated Adam's First Amendment rights.[5]

Given this background, the Court can draw several general conclusions regarding the application of the Supreme Court's precedents to student expression originating off campus.[6] First, the majority of courts will apply *Tinker* where speech originating off campus is brought to school or to the attention of school authorities, whether by the author himself or some other means. The end result established by these cases is that any speech, regardless of its geographic origin, which causes or is foreseeably likely to cause a substantial disruption of school activities can be regulated by the school. Second, some courts will apply the Supreme Court's student speech precedents, including *Tinker*, only where there is a sufficient nexus between the off-campus speech and the school. It is unclear, however, when such a nexus exists. The Second Circuit has held that a sufficient nexus exists where it is "reasonably foreseeable" that the speech would reach campus. The mere fact that the speech was brought on campus may or may not be sufficient. Third, in unique cases where the speaker took specific efforts to keep the speech off campus (*Thomas*), or clearly did not intend the speech to reach campus and publicized it in such a manner that it was unlikely to do so (*Porter*), the student speech precedents likely should not apply. In these latter scenarios, school officials have no authority, beyond the general principles governing speech in a public arena, to regulate such speech.

Applying these principles to the case at hand, the Court finds that Plaintiff's geography-based argument—i.e., that the School could not regulate the YouTube

---

5. The Fifth Circuit nonetheless found that the school principal was entitled to qualified immunity, "[g]iven the unsettled nature of First Amendment law as applied to off-campus student speech inadvertently brought on campus by others." *Id.* at 620.

6. Notably, even the Supreme Court itself has expressed some confusion over when its precedents should apply. *Morse*, 551 U.S. at 401, 127 S.Ct. 2618 ("There is some uncertainty at the outer boundaries as to when courts should apply school speech precedents.").

video because it originated off campus— unquestionably fails. First, under the majority rule, and the rule established by the Ninth Circuit in *LaVine,* the geographic origin of the speech is not material; *Tinker* applies to both on-campus and off-campus speech.

Moreover, even if the Court were to apply the Second Circuit's approach, which requires that some threshold consideration be given to the location of the speech, the YouTube video clearly has a sufficient connection to the Beverly Vista campus. Here, there is no dispute that the YouTube video actually made its way to the School. The subject of the video, C.C., came to the School with her mother on May 28, 2008 specifically to make the School aware of the video. The video was viewed at least two times on the school campus, once by Lue–Sang and once by R.S. and her father in the administration offices. Thus, the speech was brought to campus.

Further, it was reasonably foreseeable that Plaintiff's video would make its way to campus. Plaintiff posted her video on the Internet, on a site readily accessible to the general public. Cases considering the relationship between off-campus speech and the school campus more readily find a sufficient nexus exists where speech over the Internet is involved. *See Wisniewski,* 494 F.3d 34; *Doninger,* 527 F.3d 41. Additionally, Plaintiff posted the video on a week night and deliberately contacted 5 to 10 students from the School and told them to watch the video on YouTube. *See Wisniewski,* 494 F.3d at 38–39 (the fact that student transmitted his icon to 15 classmates increased the likelihood that it would reach the school campus). Plaintiff also contacted the subject of the video, C.C., and told her to watch the video. Plaintiff knew that C.C. was upset by the video.

Finally, the content of the video increases the foreseeability that the video would reach the School. The students in the video make derogatory, sexual, and defamatory statements about a thirteen-year-old classmate. One student calls C.C. "a slut," "spoiled," and an "ugly piece of shit." J.C. specifically encourages the mean-spirited discussion, telling R.S. "to continue with the Carina rant." The students collectively gang up on C.C. to the point where one of them even asks, "Am I the only one that doesn't hate Carina?" (J.C. Supporting Decl., Exh. A [YouTube video].) Given this commentary, it is not surprising that a parent made aware of the video would be sufficiently upset to bring the matter to the attention of the School.

Plaintiff argues that it was not foreseeable that the video would come to campus because students are not able to access the YouTube website on the School's computers. (Pl. Mot. for Summ. Judgmt. at 9.) Although some students may be able to access the Internet on their cell phones, it is undisputed that students are also prohibited from using their cell phones while at school. (*Id.*) Defendants have not produced any evidence that a student accessed the video on his or her cell phone while at school.

While these facts certainly are part of the analysis, they are far from dispositive. Plaintiff ignores the fact that school administrators had the ability to access the video at School; thus, once an administrator became aware of the video, it could be played on the school campus. Indeed, this is exactly what happened here. A student was upset about the video and specifically brought it to the school's attention. Several cases have applied *Tinker* where speech published or transmitted via the Internet subsequently comes to the attention of school administrators, even where there is no evidence that students accessed the speech while at school. *See, e.g., Wisniewski,* 494 F.3d 34 (applying *Tinker*

where a friend of plaintiff's printed his violent AOL Instant Message icon off the computer and brought it to a teacher); *Killion*, 136 F.Supp.2d 446 (applying *Tinker* where student emailed friends a degrading top ten list and one recipient printed the list and brought it to school); *O.Z.*, 2008 WL 4396895 (teacher discovered a violent and disturbing video created by students and posted on the Internet by searching her own name on Google.com, and later brought it to the attention of school authorities). Thus, it is not necessary that students access the speech while at school. Further, the fact that Plaintiff encouraged students to watch the video and specifically alerted C.C. about it, makes it reasonably likely that someone would alert the School officials about the video.

Finally, this case is easily distinguishable from *Thomas* and *Porter*. The plaintiffs in *Thomas* made concerted efforts to keep their newspaper off campus. Plaintiff here made no such effort; instead, she deliberately contacted some of her classmates to tell them about the video. This fact alone brings this case outside the ambit of *Thomas*. Further, in *Porter*, the plaintiff put his drawing in a closet at home where it remained for over two years before it was inadvertently transported to school by his younger brother. Here, in contrast, it took less than 24 hours for Plaintiff's video to reach the School, a fact weighing in favor of foreseeability. The method of transmission, over the Internet, was also much broader than in *Porter* and designed in such a manner to reach many persons at once. Finally, because Plaintiff contacted her classmates, it cannot be said that she "took no action that would increase the chances that [the speech] would find its way to school." *Porter*, 393 F.3d at 615.

Thus, the Court concludes that the Supreme Court precedents apply to Plaintiff's YouTube video, and that *Tinker* governs the present dispute. Clearly, *Hazelwood* and *Morse* do not apply. No one could argue that the YouTube video bore the "imprimatur" of the School, like the school newspaper in *Hazelwood*. Further, the YouTube video was not made or transmitted in connection with a school-sponsored event and does not condone illegal drug use; thus, *Morse* does not apply.

*Fraser* is also inapplicable. Although J.C.'s video certainly contains language that is lewd, vulgar, and plainly offensive, the rule in *Fraser* is limited to speech that occurs in school.[7] Indeed, the Supreme Court in *Hazelwood* expressly interpreted the holding in *Fraser* as follows:

> A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government *could not sensor similar speech outside the school*. Accordingly, we held in *Fraser* that a student could be disciplined for having delivered a speech that was 'sexually explicit' but not legally obscene at an official school assembly, because the school was entitled to 'disassociate itself' from the speech in a manner that would demonstrate to others that such vulgarity is 'wholly inconsistent with the 'fundamental values' of public school education.'

*Hazelwood*, 484 U.S. at 266–67, 108 S.Ct. 562 (emphasis added) (internal citations omitted); *see also Hedges v. Wauconda Community Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1300–01 (7th Cir.1993) (Easterbrook, J.) ("We know from *Bethel School District No. 403 v. Fraser*, that a high school may insist on civility when students speak, even though government has no such power outside school doors.") (inter-

---

7. Neither party argues that *Fraser* should apply to this case.

nal citation omitted); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 213 (3d Cir.2001) (Alito, J.) ("According to *Fraser*, then, there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech *in school.*") (emphasis added); *J.S. ex rel. Snyder v. Blue Mountain School Dist.*, 593 F.3d 286, 317 (3d Cir.2010) (Chagares, J., concurring in part and dissenting in part) ("*Fraser* does not apply to off-campus speech."). The Court is not aware of any authority from the circuit courts applying *Fraser* to speech that takes place off campus.[8] Moreover, the reasoning of *Fraser*, which is anchored in the school's duty to teach norms of civility to its students, does not support extending *Fraser* to lewd or offensive speech occurring off campus. For these reasons, the Court will not apply *Fraser* to Plaintiff's YouTube video.

In sum, the Court finds that the YouTube video clearly falls into the "all other speech" category, governed by *Tinker*. *See LaVine*, 257 F.3d at 989. The final issue for the Court to resolve, therefore, is whether J.C.'s speech created, or was reasonably likely to have created, a substantial disruption of school activities.

### 3. Substantial Disruption

 The Supreme Court in *Tinker* established that a school can regulate student speech if such speech "materially and substantially disrupt[s] the work and discipline of the school." 393 U.S. at 513, 89 S.Ct. 733. This standard does not require that the school authorities wait until an actual disruption occurs; where school authorities can "reasonably portend disruption" in light of the facts presented to them in the particular situation, regulation of student expression is permissible. *Id.* at 514, 89 S.Ct. 733; *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir.2001) ("*Tinker* does not require school officials to wait until disruption actually occurs before they may act."). As the Sixth Circuit recently explained, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first

---

**8.** The Court is aware of an unreported case from the Middle District of Pennsylvania that applied *Fraser* to off-campus speech that was posted on the Internet. *J.S. v. Blue Mountain Sch. Dist.*, No. 3:07cv585, 2008 WL 4279517 (M.D.Pa., Sept. 11, 2008) (discussed further *infra* section III.B.3.a.). The court in *J.S.* relied, in part, on a 1976 case from the same district in which the court upheld a student's suspension where the student saw a teacher at a shopping mall on a Sunday afternoon and told a friend "He's [the teacher] a prick." *Id.* at *7 (discussing *Fenton v. Stear*, 423 F.Supp. 767 (W.D.Pa.1976)). This Court finds the reasoning in *J.S.* unpersuasive. Furthermore, the holding in *Fenton* demonstrates the precise danger of extending *Fraser* to allow schools to regulate student speech occurring off campus simply because it is lewd, vulgar or offensive, and without regard to the effect that speech has on school activities. This Court does not wish to see school administrators become censors of students' speech at all times, in all places, and under all circumstances. *See Thomas v. Board of Educ.,* *Granville Central Sch. Dist.*, 607 F.2d 1043, 1052 (2d Cir.1979). Such broad authority would clearly intrude upon the rights of parents to "direct the rearing of their children." *Reno v. ACLU*, 521 U.S. 844, 865, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

Furthermore, when *Blue Mountain School District* was reviewed on appeal, the Third Circuit declined to apply *Fraser* to the student's off-campus speech. 593 F.3d 286, 298 (3d Cir.2010). While the Third Circuit did not go so far as to hold that *Fraser* could never apply to off-campus speech, the court distanced itself considerably from the district court's analysis. *Id.* at 301 ("Since we are expressly not applying *Fraser* to conduct off school grounds, there is no risk that a vulgar comment made outside the school environment will result in school discipline absent a significant risk of substantial disruption at the school.") The Third Circuit ultimately analyzed the case under *Tinker*, and concluded that the speech caused no actual substantial disruption, but that a substantial disruption was reasonably foreseeable. *Id.* at 300–01.

place." *Lowery v. Euverard,* 497 F.3d 584, 596 (6th Cir.2007).

 Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome the student's right to freedom of expression. *Tinker,* 393 U.S. at 508, 89 S.Ct. 733. In other words, the decision to discipline speech must be supported by the existence of *specific facts* that could reasonably lead school officials to forecast disruption. *LaVine,* 257 F.3d at 989. Finally, school officials must show that the regulation or prohibition of student speech was caused by something more than "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. As the Supreme Court explained: "Any word spoken in a class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." *Id.* (citing *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)).

### a. Existing Case Law

The substantial disruption inquiry is highly fact-intensive. Perhaps for that reason, existing case law has not provided clear guidelines as to when a substantial disruption is reasonably foreseeable. There is, for example, no magic number of students or classrooms that must be affected by the speech. One court has held that a substantial disruption requires something more than "a mild distraction or curiosity created by the speech" but need not rise to the level of "complete chaos." *J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.,* 569 Pa. 638, 807 A.2d 847, 868 (2002). Not surprisingly, however, the gulf between those two concepts swallows the vast majority of factual scenarios. Fur-

ther complicating matters is the fact that the Court has not uncovered any cases, in this Circuit or otherwise, that address speech targeted at a particular student, as is the case here. That being said, the Court has observed from the case law that certain factors are relevant to the substantial disruption analysis.

 First, the fact that students are discussing the speech at issue is not sufficient to create a substantial disruption, at least where there is no evidence that classroom activities were substantially disrupted. *See Tinker,* 393 U.S. at 514, 89 S.Ct. 733; *Bethlehem Area Sch. Dist.,* 807 A.2d at 868. In *Tinker,* the Court held that the students' wearing black armbands to school in protest of the Vietnam War did not cause a substantial disruption. 393 U.S. at 514, 89 S.Ct. 733. The evidence showed that the armbands caused students to make comments, to poke fun at the students wearing the armbands, and caused one student to feel "self-conscious" about attending school with his armband. *Id.* at 518, 89 S.Ct. 733 (Black, J. dissenting) (discussing facts relating to substantial disruption). One mathematics teacher also had his classroom temporarily "wrecked" by disputes with one student wearing an armband. *Id.* at 517, 89 S.Ct. 733. Nonetheless, the majority concluded that the students wearing armbands "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others." *Id.* at 514, 89 S.Ct. 733. The Court found: "They caused discussion outside of the classrooms, but no interference with work and no disorder." *Id.*

In a recent case out of the Middle District of Pennsylvania, *J.S. v. Blue Mountain School District,* the district court concluded that the substantial disruption test was not met on the basis of general discussion or student comments regarding a student's speech. No. 3:07cv585, 2008 WL

4279517 (M.D.Pa., Sept. 11, 2008), *affirmed, J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 593 F.3d 286 (3d Cir.2010). In *Blue Mountain*, a student, K.L., created a fake profile of her school principal, McGonigle, on the website MySpace.com using her home computer. *Id.* at *1. The profile included McGonigle's picture, described him as a pedophile and a sex addict, and included a message purporting to solicit young children for sexual acts. *Id.* News of the profile "soon spread to the school," and roughly 5–8 students approached K.L. to discuss it. *Id.* "Discussion of the website continued through the day, . . . with quite a few people knowing about it." *Id.* When the profile was brought to the attention of school authorities, the school suspended K.L. for 10 days. *Id.* at *2.

The district court ultimately concluded that K.L.'s fake profile was lewd, offensive, and could have been the basis for criminal charges; thus, the court analyzed K.L.'s speech under *Fraser. Id.* at *6. Nonetheless, the court found that, had *Tinker* applied to this case, an actual disruption did not occur on these facts. *Id.* at *7. The mere "buzz" about the profile, standing alone, was not sufficient under *Tinker* to constitute a substantial disruption. *See id.; see also, Layshock v. Hermitage School Dist.*, 496 F.Supp.2d 587, 600 (W.D.Pa.2007) (on substantially similar facts, the court found that student discussions regarding an unflattering MySpace profile of a school principal did not cause a substantial disruption where no classes were cancelled and no "widespread disorder" ensued.).

Thus, the mere fact that students are discussing the speech, without more, likely will be insufficient to meet the *Tinker* standard.

Where a student's speech is violent or threatening to members of the school, several courts have found that a school can reasonably portend substantial disruption. For example, in *LaVine v. Blaine School District*, 257 F.3d 981 (2001), the Ninth Circuit found that where a student showed a teacher a violent poem he had written that explicitly described a mass shooting of his classmates and his own suicide, the school was reasonable to forecast substantial disruption. The evidence demonstrated that the student had previously discussed his suicidal tendencies with the school counselor, and the school was aware that he had been involved in a domestic dispute with his father and had to leave his family home. *Id.* at 984. The school also knew that the student had recently broken up with his girlfriend and had been accused of stalking her. *Id.* The student had a prior discipline record at the school, including one act of violence. *Id.* at 989–90. Finally, the school was aware of several school shootings that had recently occurred at other campuses. *Id.* at 990. Calling this "a close case in retrospect," the Ninth Circuit found on these facts that the school officials were reasonable to portend substantial disruption and possible violence. *Id.* at 983. Thus, the court upheld the student's emergency expulsion.

Similarly, in *J.S. v. Bethlehem*, J.S. created a website that included violent and threatening comments and images about the school principal and a teacher, Mrs. Fulmer. 569 Pa. 638, 807 A.2d 847 (2002). One page on J.S.'s website included a drawing of Fulmer with her head cut off and blood dripping from her neck and was captioned, "Why Should She Die?" *Id.* at 851. It also solicited readers for money to pay for a hit man to kill Fulmer. *Id.* When Fulmer learned of the website, she was frightened, suffered anxiety and was unable to teach for the rest of the school year. *Id.* at 852. Three substitute teachers were retained to teach her class. *Id.* The school also found that the effect of the website on the students' morale was "comparable to [that of] the death of a student

or staff member." *Id.* Finally, parents also voiced concerns to the school regarding their children's safety and the quality of instruction by the substitute teachers. *Id.* at 869. On the basis of this record, the court concluded that "the web site created disorder and significantly and adversely impacted the delivery of instruction ... to a magnitude that satisfies the requirements of *Tinker.*" *Id.* at 869.

*LaVine* and *Bethlehem* both involved additional factors beyond the violent nature of the speech—e.g., the student's disciplinary past or the teacher's inability to return to school—that supported a finding of substantial disruption. Nonetheless, other courts have found a foreseeable risk of substantial disruption based solely on the violent content of the speech. For example, in *O.Z. v. Board of Trustees of the Long Beach Unified School District,* a court in this district recently held that it was reasonable for the school to portend substantial disruption where a student created a graphic video-dramatization of her teacher's murder. No. CV 08–5671 ODW (AJWx), 2008 WL 4396895 (C.D.Cal., Sept. 9, 2008). The student created the video during the spring break recess from school using her home computer, and posted the video on the YouTube.com website. *Id.* at *1. The teacher featured in the video, Rosenlof, came across it while searching her own name on the Internet through "Google." *Id.* Rosenlof was upset by the video, and informed the principal about the it. The school officials conducted an investigation and contacted O.Z. and her mother. *Id.* Although there was no evidence that the video had made its way to campus or had caused any actual disruption in school activities, the school decided to transfer O.Z. to another school. *Id.* O.Z. subsequently brought an action seeking a preliminary injunction to require the school to reenroll her at Hughes Middle School. *Id.* at *2. The court denied the preliminary injunction. *Id.* at *6.

In addressing the likelihood of success of O.Z.'s First Amendment claim, the district court found that "it would appear *reasonable,* given the violent language and unusual photos depicted in the slide show, for school officials to forecast substantial disruption of school activities." *Id.* at *3 (emphasis in original). The court explained: "If anything had happened to Mrs. Rosenlof at school, either a physical attack by O.Z. or ridicule directed at Mrs. Rosenlof by other students, it would substantially disrupt the school's activities. These are just some of the facts that might reasonably lead school officials to forecast substantial disruption." *Id.* at *4 (emphasis added).

Similarly, in *Wisniewski* (discussed above), the Second Circuit concluded that, given the violent nature of plaintiff's Internet icon, which depicted a teacher being shot in the head, "[T]here can be no doubt that the icon, once made known to the teacher or other school officials, would foreseeably create a risk of substantial disruption." 494 F.3d 34, 40 (2d Cir.2007); *but see Mahaffey v. Aldrich,* 236 F.Supp.2d 779, 784 (E.D.Mich.2002) (finding no substantial disruption where police notified the school of a student-created website that instructed readers to kill a person of their choosing in a specifically-described, gruesome fashion, but there was no evidence that the website was accessed at school, or that it "interfered with the work of the school" or "that any other student's rights were impinged.").

*O.Z.* and *Wisniewski* support the proposition that the content of the speech alone may be a sufficient basis upon which to reasonably predict a substantial disruption, at least where the speech is violent or threatens harm to a person affiliated with the school.

Another factor relevant to the substantial disruption inquiry is whether

school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech. For example, in *Doninger v. Niehoff* (discussed above), the Second Circuit found that Avery's email message and blog posting about a purportedly cancelled school event, "Jamfest," created a substantial disruption because school officials were required to deal with a "deluge of calls and emails" related to the event. 527 F.3d 41, 51 (2d Cir.2008). School officials had to quell angry parent and student concerns due to the misinformation contained in Avery's messages, and missed or were late to school-related activities as a result. *Id.* Further, the court noted that several students who participated in crafting the mass email were pulled out of class to "manage the growing dispute." *Id.* The students in general were "all riled up" thinking that Jamfest had been cancelled, and there was evidence that "a sit-in was threatened because students believed the event would not be held." *Id.* The court concluded: "It was foreseeable in this context that school operations might well be disrupted further.... " *Id.*

Similarly, in *Boucher v. School Board of the School District of Greenfield,* 134 F.3d 821 (7th Cir.1998), the fact that school officials had to devote time and energy to the harm created by the student's speech supported a finding of substantial disruption. In *Boucher,* a student, Justin, distributed an underground newspaper that

instructed students as to how to hack into the school's computers and published the school's restricted access codes. *Id.* at 822–23. When the school discovered who the author was, they expelled Justin. *Id.* at 823. Justin subsequently brought an action requesting a preliminary injunction to set aside the expulsion. *Id.* The district court granted the request, but the Seventh Circuit reversed. *Id.* at 829.

Although the Seventh Circuit's analysis primarily focused on the balance of hardships, it also found that the School Board likely would prevail on the merits of Justin's First Amendment claim. The court noted that, as a response to the article, the school had to call in technology experts to perform four hours of diagnostic tests on the computer system. *Id.* at 827. The experts noticed some evidence of computer tampering, but could not tie it directly to Justin's article. *Id.* The school also had to change all the passwords mentioned in the article. *Id.* The court found that, "this is, at a minimum, *some* evidence of past disruption, which would support an inference of potential future disruption.... " *Id.* Thus, the effort expended by the school to address the article weighed in favor of finding a risk of substantial disruption. *Id.; Cf. Layshock v. Hermitage School Dist.,* 496 F.Supp.2d 587, 601 (W.D.Pa.2007) (implying that where the school's response itself, as opposed to the underlying student speech, is the cause of substantial disruption, discipline may not be appropriate).[9]

---

**9.** *Layshock v. Hermitage School District* appears to be somewhat of an outlier. 496 F.Supp.2d 587 (W.D.Pa.2007). In *Layshock,* a student named Justin created an unflattering Internet profile of his school principal, Trosh, on the website MySpace.com. *Id.* at 591. There was evidence that Justin accessed the profile at school on December 15, 2005 and showed it to other students, and that several other students also accessed the profile during a computer class. *Id.* at 591–92. Trosh learned about Justin's profile the same evening, and also learned of several other

unflattering profiles of Trosh on MySpace, which were created by other students. *Id.* at 591.

The next morning, Trosh called a faculty meeting and told the teachers to send any students who were discussing the profiles in class to the principal's office. Roughly twenty students were sent to the office that day. *Id.* at 592. The school limited computer use from December 16 through December 21, which was the last day of school before the holiday recess. *Id.* at 592. Computer pro-

■ Finally, the Court must consider whether the school's decision to discipline is based on *evidence* or *facts* indicating a foreseeable risk of disruption, rather than undifferentiated fears or mere disapproval of the speech. In *Beussink v. Woodland R–IV School District*, the court granted a preliminary injunction in favor of the student on a First Amendment claim, finding that the principal's disciplinary measure was based on his emotional reaction to the speech, rather than any risk of disruption. 30 F.Supp.2d 1175 (E.D.Mo.1998). In *Beussink*, plaintiff had created a website criticizing the school administration. *Id.* at 1177. Another student discovered the website and accessed it at school to show it to a teacher. *Id.* at 1177–78. The teacher went directly to the principal to inform him of the site, who viewed the website and was upset. *Id.* at 1178. The principal testified that he made the decision to discipline plaintiff *"immediately* upon viewing the homepage ... because he was upset that the homepage's message had been displayed in one of his classrooms." *Id.* (emphasis in original). The website was

accessed twice more by students that day and some teachers discussed it with students; however, there was no disruption to class work. *Id.* at 1178–79.

The court concluded that the school disciplined plaintiff because the principal was upset, and not "based on a fear of disruption or interference ... (reasonable or otherwise)." *Id.* at 1180. Thus, the discipline failed to meet the requirements of *Tinker. Id.; see also, Killion v. Franklin Regional Sch. Dist.*, 136 F.Supp.2d 446 (W.D.Pa. 2001) (granting plaintiff summary judgment on First Amendment claim where the only evidence relating to substantial disruption was that two teachers were upset by plaintiff's rude top-ten list, and the list had been on school grounds for nearly a week without any disruption before the discipline was imposed); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir.2001) (Alito, J.) (finding a school's anti-harassment policy overbroad, and stating that "the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it.").

gramming classes were cancelled, and several teachers had to make revisions to their lesson plans so as to curb student access to computers in class. *Id.* at 592–93. The school technology coordinator disabled access to the MySpace website on December 19, and spent roughly 25% of his time that week on issues relating to the profiles. *Id.* at 593. On January 3, 2006, the school suspended Justin. *Id.*

In a somewhat confusing opinion, the district court concluded both that "this decision is a close call," but also that "a reasonable jury could not conclude that the 'substantial disruption' standard could be met on this record." *Id.* at 600, 601. Although it was clear that school officials had devoted a good amount of time and energy to the issue, the Court found that "[t]he actual disruption was rather minimal-no classes were cancelled, no widespread disorder occurred, there was no violence or student disciplinary action." *Id.* at 600. Further, there was some evidence that the "buzz" and student discussions were caused by the reaction of the administrators, not the profile itself. *Id.* ("Indeed, Plaintiffs

point to instances in the record in which students objected to the investigation, rather than the profile.").

But perhaps the most compelling reason for the court's holding, which distinguishes it from both *Doninger* and *Boucher*, was that three other profiles of Trosh existed on MySpace.com and were accessed by the students on campus during the same time frame. *Id.* This created a causation problem because the "School District [was] unable to connect the alleged disruption to Justin's conduct [as opposed to the other profiles]." *Id.* For these reasons, the court granted summary judgment to Justin on his First Amendment claim.

On appeal, the Third Circuit affirmed, noting that the School District did not challenge the district court's holding that the School failed to demonstrate "a sufficient nexus between Justin's speech and a substantial disruption of the school environment." *Layshock v. Hermitage Sch. Dist.*, 593 F.3d 249, 258 (3d Cir.2010).

In *Bowler v. Town of Hudson,* the District Court of Massachusetts held that a school's fear of disruption was too attenuated to warrant student discipline. 514 F.Supp.2d 168 (D.Mass.2007). In *Bowler,* plaintiffs created a non-school sponsored club promoting "pro-American, pro-conservative dialogue and speech." *Id.* at 172. They placed posters advertising the club on school walls and bulletin boards. *Id.* at 173. The posters listed a website address for an affiliated national club; the website contained links to violent and disturbing images, including "brutal beheadings." *Id.* When school officials discovered this, they removed all the posters and disabled student access to the website from school grounds. *Id.* Over the several months that followed, school officials repeatedly told plaintiffs that they could not advertise the website on any posters placed on school grounds, and eventually adopted policies requiring all students to secure prior approval for any posted material and forbidding any web addresses from being listed on posters. *Id.* at 174–75. Plaintiffs brought an action against the school, the town, and school officials for unlawful censorship under the First Amendment. *Id.* at 171.

Defendants moved for summary judgment, arguing that censorship was permissible under *Tinker* because the graphic content of the videos on the website "threatened to materially and substantially disrupt school operations." *Id.* at 177. Specifically, the school argued that students who viewed the videos might suffer a negative psychological reaction and "require counseling to cope with their subsequent feelings of helplessness and despair." *Id.* at 178. The district court rejected this argument as entirely too speculative. *Id.* The court noted that in order for this predicted parade of horribles to occur students would have to (1) view the posters, (2) access the website outside school, (3) discover the links to the disturb-

ing videos, (4) navigate past an express warning, (5) click on the videos, and (6) be disturbed and seek counseling. *Id.* at 177–78. The court found no *evidence* that the videos would result in a substantial interference, and the mere *risk* that student counseling or unplanned classroom discussions may be required was not sufficient. *Id.* at 178. The school's actions, therefore, could not be justified under *Tinker.*

■ In contrast, where "a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster." *Saxe,* 240 F.3d at 212. For example, in *West v. Derby Unified School District No. 260,* the Tenth Circuit upheld a student's suspension for drawing a Confederate flag in violation of the school's policy against racial harassment. 206 F.3d 1358 (10th Cir.2000). In so doing, the Tenth Circuit adopted the following reasoning from the district court:

> School officials in Derby had evidence from which they could reasonably conclude that possession and display of Confederate flag images, when unconnected with any legitimate educational purpose, would likely lead to a material and substantial disruption of school discipline. The district experienced a series of racial incidents or confrontations in 1995, some of which were related to the Confederate flag. The incidents included hostile confrontations between a group of white and black students at school and at least one fight at a high school football game.... The history of racial tension in the district had made administrators' and parents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable.

*Id.* at 1366; *Cf. Chalifoux v. New Caney Independent Sch. Dist.,* 976 F.Supp. 659 (S.D.Tex.1997) (school violated First

Amendment by prohibiting devout Catholic students from wearing rosaries in violation of a dress code prohibiting gang-related apparel where there was no evidence that plaintiffs were misidentified as gang members or that they attracted the attention from other students because of the rosaries). Thus, where the school can demonstrate a prior history of disruptions caused by the type of speech at issue, this weighs strongly in favor of finding that the school's prediction of disruption was reasonable.

#### b. Application to the Current Record on Summary Judgment

■ Based on the undisputed facts, and viewing all reasonable inferences in favor of the Defendants, the Court finds that no reasonable jury could conclude that J.C.'s YouTube video caused a substantial disruption to school activities, or that there was a reasonably foreseeable risk of substantial disruption as a result of the YouTube video.

#### i. Actual Disruption

First, what the Defendants contend was an actual disruption is entirely too de minimis as a matter of law to constitute a substantial disruption. Interpreting the facts in the most favorable light for Defendants, at most, the record shows that the School had to address the concerns of an upset parent and a student who temporarily refused to go to class, and that five students missed some undetermined portion of their classes on May 28, 2008. This does not rise to the level of a substantial disruption.

Unlike in the many cases in which courts have found a substantial disruption (*LaVine, Wisniewski, O.Z.,* and *Bethlehem*) J.C.'s video was not violent or threatening. There was no reason for the School to believe that C.C.'s safety was in jeopardy or that any student would try to harm C.C. as a result of the video. Certainly, C.C. never testified that she feared any type of physical attack as a result of the video. Instead, C.C. felt embarrassed, her feelings were hurt, and she temporarily did not want to go to class. These concerns cannot, without more, warrant school discipline. The Court does not take issue with Defendants' argument that young students often say hurtful things to each other, and that students with limited maturity may have emotional conflicts over even minor comments. However, to allow the School to cast this wide a net and suspend a student simply because another student takes offense to her speech, without any evidence that such speech caused a substantial disruption of the school's activities, runs afoul of *Tinker.*

Moreover, the evidence demonstrates that C.C.'s hurt feelings did not cause any type of school disruption. C.C. did not confront J.C. or any of the other students involved in the video, either verbally or physically, while at school, nor did she indicate any intention to do so. Further, while C.C. was undoubtedly upset, it took the school counselor, at most, 20–25 minutes to calm C.C. down and convince her to go to class. (Def. ACF 10.) Although the time line is not entirely clear, C.C. likely missed no more than a single class on the morning of May 28, 2008. (Allen Supporting Decl., Exh. N [Lue Sang Depo. at 15:4–11].)

Other students also missed some of their classes on May 28, 2008 as a result of the School's investigation of the YouTube video. However, there is no evidence that the school's investigation had any ripple effects on class activities or the work of the School. For example, it appears that the students involved in the video simply left class when asked, quietly and without incident. Hart testified that the entire investigation was resolved and all the students returned to class before the lunch recess on May 28, 2008. (Declaration of

John Allen In Support of Def.'s Mot. For Summary Judgment ["Allen Supporting Decl."], Exh. Q. [Hart Depo. at 20:14–23] [testifying that J.C. was called the administrative office between 9:30 a.m. and 10:15 a.m., and the whole incident related to the video was over before lunch that day].) Further, there appears to have been no classroom disruption upon these students returning to class.

There is also no evidence that the video itself had any effect on classroom activities. No widespread whispering campaign was sparked by the video; no students were found gossiping about C.C. or about the video while in class. As far as the record demonstrates, not a single student watched the video while at school. Moreover, while J.C. testified that she saw 5 to 10 students talking about the video on campus on the morning of May 28, there is no evidence that this discussion occurred during class or that it otherwise disrupted school work. More importantly, the record is silent as to whether the individual Defendants, or even C.C., were aware of the discussion among those 5 to 10 students on May 28, 2008; thus, the discussion could not have informed the School's decision to suspend J.C.

It appears that the most significant effects of the video were that J.C. and R.S. were sent home from school, and that J.C. was suspended for two days.[10] Clearly, however, the School cannot point to the discipline itself as a substantial disruption.

Defendants argue, in part, that a substantial disruption occurred, as in Doning-er, because the three individual defendants "were taken away from other tasks in order to deal with the disruption created by Plaintiff's conduct." (Opp'n at 9.) The Court disagrees. Doninger is readily distinguishable from the present case because, in Doninger, the school officials introduced evidence that, over the course of two days, they had to miss or arrive late to several other school events to deal with the controversy caused by Avery's speech. 527 F.3d at 51. For several days, the school officials had to respond to "a deluge" of calls and emails from angry students and parents and had to take action to quell a threatened "sit-in" by the students. Id. Thus, the disruption created in Doninger was highly out of the ordinary, not a response to the every day emotional conflicts that students often get into.[11]

Here, in contrast, Defendants have presented *no evidence* that they missed or were late to any other school activities, nor have Defendants shown that the actions they took to resolve the situation created by the video were outside the realm of ordinary school activities. Instead, the record demonstrates that Hart and Lue-Sang took steps to investigate the nature of the conflict between J.C. and C.C., to counsel C.C. when she was upset, and to decide, along with Warren's input, whether to impose discipline. That is what school administrators do. As long as students have attended school, some get sent to the principal's office for possible discipline, some seek counseling from the school

---

10. Defendants contend that it was R.S.'s father who took her out of school for the day as a result of the video. (Def.'s ACF 12.) However, Lue–Sang's testimony establishes that she *asked* R.S.'s father to take R.S. out of school for the day. (Allen Supporting Decl., Exh. P [Lue Sang Depo. at 79:2–22].) Thus, although no formal disciplinary action was taken against R.S., the record is clear that she was taken out of school at Defendants' request.

11. This is also true in *Boucher,* 134 F.3d 821 (discussed above). There, the school had to call in technology experts to perform diagnostic tests on the school computers and change all the access codes. *Id.* at 827–28. Clearly, this in not within the realm of normal, everyday school activities.

counselors, and upset parents on occasion voice concerns to the school, whether it be about a child's poor grades, a student-teacher personality conflict, or otherwise. There is nothing in the record to demonstrate that J.C.'s conduct presented an unusual or extraordinary situation like that in *Doninger*, or even in *Boucher*.[12] *See Blue Mountain Sch. Dist.*, 593 F.3d at 299 (holding that, "[t]he minor inconveniences associated with the [speech], including [the principal's] meetings related to it, students talking in class for a few minutes, and some school officials rearranging their schedules to assist [the principal] may have resulted in some disruption, but certainly did not rise to a substantial one.")

In sum, Defendants have not presented any evidence demonstrating that they were pulled away from their ordinary activities as a result of the YouTube video.

For the *Tinker* test to have any reasonable limits, the word "substantial" must equate to something more than the ordinary personality conflicts among middle school students that may leave one student feeling hurt or insecure. Likewise, the Court finds that the mere fact that a handful of students are pulled out of class for a few hours at most, without more, cannot be sufficient. *Tinker* establishes that a material and substantial disruption is one that affects "the work of the school" or "school activities" in general. *See Tinker*, 393 U.S. at 509, 514, 89 S.Ct. 733. Thus, while the precise scope of the substantial disruption test is still being sketched by lower courts, where discipline is based on actual disruption (as opposed to a fear of pending disruption), the School's decision must be anchored in something greater

than one individual student's difficult day (or hour) on campus. *See, e.g., J.S. v. Bethlehem*, 807 A.2d at 852 (the effect of the website on the morale of the students and staff in general were comparable to the death of a student or staff member); *Doninger*, 527 F.3d at 51 (plaintiffs' speech had the entire school all "riled-up" and students were threatening a protest). The record on summary judgment does not present a disruption of sufficient magnitude to satisfy *Tinker*.

### ii. Foreseeable Risk of Future Substantial Disruption

Defendants also argue that their decision to discipline J.C. was based on a reasonable belief that the YouTube video was likely to cause a substantial disruption in the future. In support, Defendants present the testimony of Lue–Sang, the administrative principal. Lue–Sang testified that she believed classes would be disrupted by the video as a result of students "gossip[ing]" and "passing notes" in class instead of focusing on the lesson, and "children worr[ying] about whether or not something she had said had been video-taped and whether or not that would show up on line." (Allen Supporting Decl., Exh. S [Lue–Sang Depo. at 99:13–21].)

There appears to be some factual support for Lue–Sang's prediction. For example, although Lue–Sang did not state *why* she thought the video would lead to gossip or passing notes during class, individual Defendant Hart testified that the YouTube video had 100 "hits" or "views" by the time she watched it on the morning of May 28, 2008. (Allen Supporting Decl., Exh. N [Hart Depo. at 29:5–20].) Hart

---

**12.** Defendant Hart is a perfect illustration. Hart is the school counselor at Beverly Vista Middle School. Presumably, her primary obligation is to counsel students who are upset or who may be subject to school discipline. It cannot be said, therefore, that Hart was torn away from her regular activities on May 28, 2008, when in fact, her very purpose at Beverly Vista is to counsel the student body. The same can be said of Lue–Sang. No reasonable jury could conclude that an administrative principal was pulled away from her usual tasks by consulting with the principal to decide whether to discipline a child.

also testified that C.C. told her that C.C. had been contacted by other students about the video, and that Hart believed, based on this conversation, that about half the eighth grade class had seen the video. *Id.* Thus, there is some evidence that Hart believed a sufficient number of students had already seen the video, and in turn, likely would discuss it. It is not clear, however, if Hart relayed this information to Lue–Sang. That said, given Hart and Lue–Sang's joint involvement in the investigation, and construing all reasonable inferences in favor of Defendants, the Court can reasonably infer that Hart shared this information with Lue–Sang.

Nonetheless, even assuming that Lue–Sang's prediction is reasonable and is supported by sufficient evidence, the fear that students would "gossip" or "pass notes" in class simply does rise to the level of a substantial disruption. As noted above, several cases, including *Tinker*, have found that a general "buzz" about a student's speech fails to meet the substantial disruption test. *Tinker*, 393 U.S. at 514, 89 S.Ct. 733, *Bethlehem Area Sch. Dist.*, 807 A.2d at 868; *Blue Mountain Sch. Dist.*, 2008 WL 4279517, at *7. Moreover, the speech must create something more than a "mild distraction or curiosity" in order to past muster under *Tinker*. Thus, the School's fear that thirteen-year-old students might pass notes in class and worry about their reputation while in school cannot support the School's decision to discipline J.C.

Lue–Sang also testified that she feared that the video would lead to students taking sides and possible violence among classmates. (Def. Statement of Genuine Issues, Additional Controverted Fact ["Def. ACF"] 14; Allen Opp'n Decl., Exh. Q [Lue–Sang Depo. at 102:6–14].) Lue–Sang based this belief on: "Past experi-

ence. I base that on human nature. I base that on children who are not that mature, they have to take a breath and take a step back and think things through." (*Id.*) Further, Defendants argue that there was "a possibility that C.C. had no clique and, therefore, felt she was being ganged up on by the posting of the video and the dissemination of that fact to other students." (Opp'n at 10.)

The Court finds that Lue–Sang's concern is too attenuated from the facts, and appears to be based largely on speculation. Here, for example, Lue–Sang admitted that none of the students involved in the YouTube video had a history of violence. (Allen Opp'n Decl., Exh. Q [Lue–Sang Depo. at 102:6–14].) There is also no evidence regarding the prior relationship between C.C. and the other students involved in the making of the video that would support a prediction that a verbal or physical confrontation was likely to occur. Had Defendants established that, for example, C.C. and R.S. had engaged in a verbal dispute during class over similar comments in the past, or that J.C. and C.C. often were disciplined for arguing with each other during school, that would certainly be relevant to the analysis. No such evidence exists here. Also absent from the record is any evidence of C.C.'s social history; certainly there is no basis upon which the fact-finder could conclude that "C.C. had no clique," as Defendants' surmise.

Even in the absence of specific evidence about these particular students, Defendants could have supported their fear of a future substantial disruption with evidence that student speech similar to the YouTube video had resulted in violence or near violence at Beverly Vista in the past.[13] *See e.g., West v. Derby Unified,*

---

**13.** The Court recognizes that the School need not prove that violence was likely to result from the YouTube video. There may be other types of disruption caused by a student's speech that exceed the mere "buzz" around campus, but fall short of violence. *See e.g.,*

206 F.3d 1358 (images of the confederate flag and other racially-charged symbols had caused verbal and physical confrontations among students in the past). However, the record is silent in this regard as well.[14]

A comparison of this case to the record in *LaVine* helps illustrate the Defendants' evidentiary shortcomings. In *LaVine*, the student, James, wrote a violent, gruesome and graphically-described poem about killing himself and shooting a large number of his classmates at school. Not only were the contents of the speech clearly disturbing, to say the least, the school also knew that James had a documented history of suicidal ideations, a lengthy school discipline record (including an act of violence), problems at home (including domestic violence with his father), and had been accused of stalking his ex-girlfriend. Further, the school was aware of several other recent mass school shootings in other schools that were similar to those described in James' poem. Although the Ninth Circuit upheld the school's decision to expel James, the court expressly held

that "this is a close case in retrospect." 257 F.3d at 983.

Clearly, the record here falls far short of the evidence supporting the school's decision in *LaVine*. Here, without any evidence of a history of disruptive verbal or physical altercations between the students involved in the video, or of similar student speech causing any type of disruption to school activity in the past, no reasonable fact finder could conclude that the YouTube video was reasonably likely to cause the type of future substantial disruption recognized in *LaVine*.

Defendants, however, implore the Court to consider the age of the children involved in this dispute. Defendants repeatedly stress that C.C. and her classmates were only 13 years old, and that their emotional maturity is clearly limited. Defendants contend that it is not unusual for thirteen-year-olds to "form cliques, nor for disagreements between such cliques to erupt in violence." (Opp'n at 10.) Thus, the School contends that it should be accorded some deference to decide how best to protect the emotional well-being of its young students. The Court in large part agrees.

*Doninger,* 527 F.3d at 51 (substantial disruption found where school officials had to respond to complaints, and students were "all riled-up" and threatened a sit-in). However, the Court has limited its discussion to the reasons proffered by Defendants for having believed a substantial disruption would occur—i.e., that the video would lead to gossip and distractions (buzz) or that it might lead to violence. For the reasons explained above, both these arguments fail.

14. The Court notes that there is some evidence that J.C. had a history of videotaping while at school. (Def.'s ACF 14.) She had been suspended earlier that same year for videotaping a teacher, and had posted another video on YouTube of her friends talking at school. (DSUF 41, 43.) However, these facts are not relevant to the substantial disruption analysis. J.C.'s prior discipline was not based on speech or expression. Instead, J.C. had

been disciplined for violating a school rule that prohibited students from videotaping others while in class. (Declaration of Erik Warren in Support of Def.'s Mot. For Summary Judgment ¶ 10 and Exh. A, pg. 9, ¶ 14; Allen Supporting Decl., Exh. EE [J.C. Depo. at 23:4–19].) Thus, J.C. was disciplined for conduct, not speech. J.C.'s prior suspension does not implicate the First Amendment.

Further, to the extent that the Defendants argue that J.C. was suspended not only for the YouTube video, but also on the basis of her prior acts, this argument fails. Having concluded that J.C.'s YouTube video did not cause, or was not reasonably likely to cause, a substantial disruption under *Tinker*, the school had no right to regulate such speech. Thus, the YouTube video should not have formed *any* basis for the suspension, regardless of whether J.C. had a prior disciplinary record.

Indeed, no one could seriously challenge that thirteen-year-olds often say mean-spirited things about one another, or that a teenager likely will weather a verbal attack less ably than an adult. The Court accepts that C.C. was upset, even hysterical, about the YouTube video, and that the School's only goal was to console C.C. and to resolve the situation as quickly as possible.

Unfortunately for the School, good intentions do not suffice here. Defendants have failed to present sufficient evidence that the YouTube video caused a substantial disruption to school activity on May 28, 2008. Further, Defendants' fear that a substantial disruption was likely to occur simply is not supported by the facts. The Court cannot uphold school discipline of student speech simply because young persons are unpredictable or immature, or because, in general, teenagers are emotionally fragile and may often fight over hurtful comments. To create a genuine issue for trial, Defendants must tie those conclusions to the situation presented to them on May 28, 2008. On this record, they have failed to do so.[15]

In sum, the Court finds that, based on the undisputed facts, Plaintiff is entitled to judgment as a matter of law on her First Amendment claims. Plaintiff's motion for summary judgment as to the First and Second causes of action is therefore GRANTED.

**4. Speech that Impinges On the Rights of Others**

◼ Before moving on to address the defense of qualified immunity, the Court will briefly address one additional school speech argument that appears to be raised by Defendants here. In addition to the substantial disruption test, *Tinker* held that a school may regulate student speech that interferes with the "the school's work or [collides] with the rights of other students to be secure and be let alone." 393 U.S. at 508, 89 S.Ct. 733. Thus, it appears that speech that "impinge[s] upon the rights of other students" may be prohibited even if a substantial disruption to school activities is not reasonably foreseeable. *Id.* at 509, 89 S.Ct. 733. That said, the precise scope of Tinker's "interference with the rights of others" language is unclear, as the Court's analysis in *Tinker* focused primarily on whether a substantial disruption was reasonably foreseeable. Moreover, lower courts have not often applied the "rights of others" prong from *Tinker.*

Defendants rely, in part, on Ninth Circuit case interpreting the *Tinker* rights of others prong, *Harper v. Poway Unified School District.* (Mot. at 10–11.) In *Harper,* the Ninth Circuit held that a student's decision to wear a T-shirt with a religious message condemning homosexuality during the school's "Day of Silence" impinged upon the rights of other students under *Tinker.* 445 F.3d 1166 (9th Cir.2006).[16]

---

**15.** The Court's ruling is limited to the issue of whether, and under what circumstances, the School can discipline a student for off-campus speech within the bounds of the First Amendment. Whether a student separately may be liable in tort for defamatory, derogatory, or threatening statements made about a classmate and published over the Internet, often called "cyber-bullying," is not at issue here. *See, e.g., D.C. v. R.R.,* 182 Cal.App.4th 1190, 106 Cal.Rptr.3d 399 (Cal.App.,2010).

**16.** This decision was vacated as moot by *Harper v. Poway Unified Sch. Dist.,* 549 U.S. 1262, 127 S.Ct. 1484, 167 L.Ed.2d 225 (2007). By the time the case reached the Supreme Court on certiorari, the district court had entered final judgment dismissing plaintiff's claims for injunctive relief as moot. The Court vacated the prior judgment denying the preliminary injunction "to clear the path for future relitigation of the issues between the parties and to eliminate a judgment, review of which was prevented by happenstance." *Id.*

The Day of Silence was intended to "teach tolerance of others, particularly those of a different sexual orientation." *Id.* at 1171 (internal citations to the record omitted). On that day (and the day after), student Tyler Harper came to school wearing a T-shirt on which the words "Homosexuality is Shameful" were handwritten. *Id.* Harper was sent to the administrative offices and was not permitted to return to class for the rest of the day. *Id.* at 1172–73. Shortly thereafter, Harper brought suit against the School District, alleging (among other things) a violation of his First Amendment rights. *Id.* at 1173.

The district court denied Harper's request for a preliminary injunction, and the Ninth Circuit affirmed. Analyzing the case under the rights of others prong from *Tinker,* the Ninth Circuit found that the speech constituted a "verbal assault [to public school students] on the basis of a core identifying characteristic such as race, religion, or sexual orientation." *Id.* at 1178. The court found that: "It is simply not a novel [or disputed] concept, however, that such attacks on young minority students can be harmful to their self-esteem and to their ability to learn." *Id.* at 1180. Thus, the court held that student speech that attacks "particularly vulnerable" students on the grounds of "a core characteristic"—namely, race, religion, and sexual orientation—impinged on the rights of others and could be regulated under *Tinker. Id.* at 1182. The court, however, expressly limited its holding to

speech attacking students on those three grounds, and even declined to extend its holding to remarks based on gender.[17]

Defendants argue that *Harper* demonstrates that "California schools have an obligation to protect students from psychological assaults that cause them to question their self worth." (Mot. at 11.) This is undoubtedly true; however, California schools cannot exercise this obligation in a manner that infringes upon other student's First Amendment rights. The task for this Court is not to assess whether the School's intentions were noble; no one could dispute that the School was attempting to protect C.C. from psychological harm. That said, the Court is not aware of any authority, including *Harper,* that extends the *Tinker* rights of others prong so far as to hold that a school may regulate any speech that may cause some emotional harm to a student. This Court declines to be the first.

In sum, the Court finds that the rights of others test from *Tinker* is not applicable to the present case.

For the reasons stated, Plaintiff's Motion for Summary Adjudication on the First and Second causes of action for violation of the First Amendment under § 1983 is GRANTED.

### C. Qualified Immunity

▮ The individual Defendants, Erik Warren, Cherryne Lue–Sang, and Janice Hart, seek summary adjudication as to

---

17. *Harper* has not often been cited by other courts for the proposition that speech attacking students on the basis of race, religion or sexual orientation may be regulated under the "rights of others" standard in *Tinker.* Further, those cases that do cite to *Harper* decline to extend its holding to other types of speech. *See, e.g., Bowler v. Town of Hudson,* 514 F.Supp.2d 168, 179 (D.Mass.2007) (discussed above) (distinguishing students' posters that included a reference to a website with links to

violent content from "derogatory or injurious remarks directed at student's minority status," and rejecting defendants' argument that *Harper* applied); *Zamecnik v. Indian Prairie Sch. Dist. No. 204 Board of Education,* 619 F.Supp.2d 517, 523 (N.D.Ill.2007) (citing *Harper* for the proposition that "derogatory and negative statements about homosexuality tend to harm homosexual youth by lowering their self esteem").

Plaintiff's First Cause of Action, on the ground that they are entitled to qualified immunity. For the reasons stated below, the individual Defendants' motion is GRANTED.

 The doctrine of qualified immunity shields public officials sued in their individual capacity from monetary damages, unless their conduct is violates "clearly established" law of which a reasonable public officer would have known. *Saucier v. Katz*, 533 U.S. 194, 199, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (officials should be shielded from damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"). The defense " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent and those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

 The court must make a two-step inquiry in deciding the issue of qualified immunity. *Saucier*, 533 U.S. at 200, 121 S.Ct. 2151. First, the court must determine whether, under the facts alleged, taken in the light most favorable to the plaintiff, a violation of a constitutional right occurred. *Id.* If so, the court must then ask whether the constitutional right was clearly established at the time of the violation. *Id.* "A right is 'clearly established' for purposes of qualified immunity when its contours are sufficiently clear that reasonable officials would know that their actions violated that right." *Layshock v. Hermitage Sch. Dist.*, 496 F.Supp.2d 587, 603 (W.D.Pa.2007); *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

Initially, the Supreme Court in *Saucier* held that these two inquiries must be decided in rigid order. *Saucier*, 533 U.S. at 200, 121 S.Ct. 2151. That is, a district court had to resolve whether a violation of a constitutional right occurred before it could evaluate whether the right was clearly established. Recognizing, however, that "there are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," the Supreme Court recently relaxed the order of analysis. *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). In *Pearson*, the Court held that the *Saucier* analysis may be addressed in either order if the second step is clearly dispositive and can address the matter efficiently. *Id.* at 821.

Here, although the Court has found that a violation of J.C.'s First Amendment rights has occurred, the second *Saucier* step unequivocally resolves the issue of qualified immunity in Defendants' favor.

 Plaintiff has the burden of proving that the right allegedly violated was clearly established at the time of the defendant's conduct. *Trevino v. Gates*, 99 F.3d 911, 916–17 (9th Cir.1996). To determine whether a law is clearly established, the court "survey[s] the legal landscape" and examines those cases that are "most like" the present case. *Id.* at 917 (quoting *Figueroa v. United States*, 7 F.3d 1405, 1409 (9th Cir.1993)). In the Ninth Circuit, specific binding precedent is not required to show that a right is clearly established for purposes of the qualified immunity analysis. *Maraziti v. First Interstate Bank of Calif.*, 953 F.2d 520, 525 (9th Cir.1992) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir.1988)). In the absence of binding precedent, district courts should look to "all available decisional law including the decisions of state

courts, other circuits, and district courts to determine whether the right was clearly established." *Id.* Where the specific factual scenario presented has not been previously litigated and decided, the court may nonetheless find clearly established law if "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

Here, there is no binding Supreme Court precedent that governs J.C.'s conduct. The Supreme Court has yet to address whether off-campus speech posted on the Internet, which subsequently makes its way to campus either by the speaker or by any other means, may be regulated by school officials. *Tinker* only addressed student speech originating on campus. Further, each of the three Supreme Court cases decided after *Tinker* carved out specific enclaves in which student speech is subject to discipline—i.e., lewd speech, speech bearing the imprimatur of the school, or speech taking place at a school-sponsored event and relating to illegal drug use. None of those factual settings are present here.

Plaintiff nonetheless argues that "there is a long line of precedents stretching back almost 40 years which provides geographical limitations on a school's power to punish students for what they say, making this *an obvious case* of school officials violating a student's First Amendment rights." (Opp'n at 2.) (emphasis added). This argument clearly misinterprets the existing law. As discussed in detail above, a number of district and circuit courts, including the Ninth Circuit, have applied *Tinker* di-

rectly to speech that somehow makes its way to campus, regardless of where the speech originated, and regardless of whether the speaker himself or someone else was responsible for bringing it to campus. Further, the only Ninth Circuit authority the Court is aware of which addressed speech that originated off campus, without any connection to a school project and without the use of school resources, *upheld the School's regulation of the speech. LaVine v. Blaine School District*, 257 F.3d 981 (9th Cir.2001). As far back as 30 years ago, a distinguished panel of the Second Circuit recognized that "territoriality is not necessarily a useful concept in determining the limit of [the school's authority to discipline]," *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1058 n. 13 (Newman, J., concurring), and that students can "incite[ ] substantial disruption within the school from some remote locale." *Id.* at 1052 n. 17 (Kaufman, J., majority).

The one district court case cited by Plaintiff, *Emmett v. Kent Sch. Dist. No. 415*, does not provide otherwise. 92 F.Supp.2d 1088 (2000). First, contrary to Plaintiff's contention, *Emmett did not hold* that "speech on the Internet, having nothing to do with school and not accessed at school, cannot be regulated." (Opp'n at 11.) In fact, *Emmett* did not decide the issue at all, merely holding that plaintiff had shown a sufficient likelihood of success on his First Amendment claim to support a preliminary injunction. *Id.* at 1090. Further, the *Emmett* court expressly based its holding on the application of *Tinker*—thereby implicitly accepting that speech created off campus and posted on the Internet *could be* regulated provided that the substantial disruption test was met. *Id.*[18]

---

**18.** In *Emmett,* the student's website never made it to campus at all, and there was no evidence that any student brought it to the School's attention or that any disturbance whatsoever had occurred; rather, the School

became aware of the website merely because it had been featured on the local news. 92 F.Supp.2d. at 1089–90. Thus, no substantial disruption could be established on these facts. *See id.* at 1090.

Plaintiff has not cited, and the Court has not found, any case holding that a student's speech that actually caused a substantial disruption on campus, or was reasonably likely to do so, was outside of the realm of school discipline simply because it originated off campus.

Additionally, while numerous recent cases have applied the Supreme Court's student speech precedents to cases involving student speech over the Internet, see *Beussink, Emmett, Killion, O.Z., Wisniewski, Doninger,* and *Bethlehem,* none have done so in a factually analogous setting. The Court has yet to find a student-speech case addressing hurtful and embarrassing speech directed at a student's classmate, which emanated outside the school grounds.

Less than a year before J.C. created the YouTube video, the Supreme Court in *Morse* pointedly recognized the "uncertainty as to the boundaries of the school speech precedents" and the "necessity for school administrators to react decisively to unexpected events." *Layshock,* 496 F.Supp.2d at 604 (citing *Morse,* 551 U.S. 393, 127 S.Ct. 2618). While the five separate opinions in *Morse* aptly illustrate the "plethora of approaches that may be taken in this murky area of the law," (*id.*), the Justices were unanimous in at least one respect-all agreed that the principal was entitled to qualified immunity. *Morse,* 551 U.S. at 409, 127 S.Ct. 2618. The same conclusion is obvious here. Certainly, the contours of a student's First Amendment right to make a potentially defamatory and degrading video about a classmate, which is almost immediately thereafter brought to the School's attention, are not clearly established.

In sum, Hart, Lue–Sang, and Warren are clearly entitled to qualified immunity in this case.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Adjudication as to her First and Second causes of action for violation of section 1983 is GRANTED.

The individual Defendants, Hart, Lue–Sang, and Warren's Motion for Summary Adjudication on the issue of qualified immunity as to the First Cause of Action is GRANTED.

An order regarding Plaintiff's Motion for Summary Adjudication as to the due process claim will follow shortly.

IT IS SO ORDERED.